(82 N. W. Rep. 727.)

---

HAMILTON L. WHITHED vs. ST. ANTHONY & DAKOTA ELEVATOR COMPANY, et al.

**Mortgage Foreclosure—Rights of Purchaser—Rents—Crops.**

The purchaser of real estate at a mortgage foreclosure sale is entitled to receive from the tenant in possession the rents of the property sold, or the value of the use and occupation thereof, from the date of his purchase until redemption is made, under section 5549, Rev. Codes. *Held*, under the foregoing section of the statute, that where farm lands, which are being operated under a contract with the owner which reserves the title and possession of a fixed portion of the grain grown thereon in the owner, as compensation for its use, are sold at foreclosure sale, the purchaser thereof at such sale is entitled to such share as falls during such redemption period and has the same rights thereto as the owner of the land had, and may invoke the same remedies to enforce them.

Wallin, J., dissenting.

Appeal from District Court, Grand Forks County; *Fisk*, J.

Action by H. L. Whithed against the St. Anthony & Dakota Elevator Company and T. S. Edison. Judgment for defendants and plaintiff appeals.

Reversed.

*Corbet & Murphy,* for appellant.

The purchaser from the time of sale until redemption and a redemptioner from the time of his redemption until another redemption is entitled to receive from the tenant in possession the rents of the property sold, or the value of the use and occupation thereof. § 5549, Rev. Codes; *Clement* v. *Shipley,* 2 N. D. 430, 51 N. W. Rep. 414. One that holds or possesses land or tenement by any kind of title, either in fee, for life, years, or at will, may be a tenant in possession within the meaning of the statute. *Harris* v. *Reynolds,* 13 Cal. 515, 25 Am. & Eng. Enc. L. 895; *Walker* v. *McCusker,* 71 Cal. 594; *Knight* v. *Truett,* 18 Cal. 113; *Shores* v. *Scott River Co.,* 21 Cal. 135; *Walls* v. *Walker,* 37 Cal. 425. The statute recognizes the purchaser as the owner in equity of the land, subject only to the right of redemption, and gives him the rents and profits, or the value of the use and occupation, in short, the entire beneficial interest except the actual possession. § 5538, Rev. Codes; *Page* v. *Rogers,* 31 Cal. 293; *Harris* v. *Reynolds,* 13 Cal. 516.

*O. A. Wilcox,* and *Cochrane & Corliss,* for respondents.

The contract in question did not create the relation of landlord and tenant, and therefore afforded no basis for a recovery of the rent. *Bowers* v. *Graves,* 66 N. W. Rep. 231; *Chase* v. *McDonald,* 24 Ill. 236; *Altwood* v. *Ruckaman,* 21 Ill. 200; *Braddish* v. *Schnek,* 8 Johns. 151; *Caswell* v. *Districh,* 15 Wend. 379; *Adams* v. *McKesson,* 53 Pa. St. 81. The compensation for the use of land where the relation of landlord and tenant does not exist cannot be called rent. *Moulton* v. *Robinson,* 27 N. H. 550, 12 Am. & Eng. Enc. L. 730. The appellant in this case has no greater right to recover the crops grown on the land against the party in possession after they are severed than the owner of land would have as against a trespasser who crops the land and severs the crops. The remedy of the owner is an action for damages done to and for withholding possession of the land. *Lindsay* v. *Ry. Co.,* 29 Minn. 411, 43 Am. Rep. 228. The party in possession of land sold under foreclosure is not divested of his right to the standing crop until the period of redemption has expired and until the execution of the sheriff's deed. *Everingham* v. *Braden,* 12 N. W. Rep. 142; *Allen* v. *Elderkin,* 22 N. W. Rep. 842.

YOUNG, J. This is an action in claim and delivery brought by a purchaser of real estate at foreclosure sale to recover the possession of a quantity of wheat grown upon such land during the redemption period. The case was tried to the court without a jury, and findings of fact were made by the trial judge upon all material points. From the facts found the trial court concluded, as matter of law, that the plaintiff was not entitled to recover, and a judgment was entered dismissing the action. Plaintiff appeals from the judgment.

The appellant does not attack any of the findings of fact, but accepts them as correct. His only assignment of error is aimed at the trial court's conclusion that such facts do not warrant a recovery

by plaintiff. To make clear this point, upon which we must rule, a recital of a few facts is necessary: One Ditton was the owner of the land in question. On April 11, 1898, he entered into a written contract with one Filson, wherein the latter agreed to farm and cultivate said land at his own expense for the farming season of 1898. This contract was quite similar in its provisions to those commonly used when lands are operated upon shares. Ditton, the owner of the land, was to have one half of all grain raised, to be taken from the machine, as his share. Filson, who produced the grain, was to have the other half of it as his share, but not until all of his various covenants and agreements in the contract had been kept and performed. Until that time the title and possession of all the grain grown were to be in Ditton. The land was farmed by Filson under this contract during the year 1898. A division of the grain was made, and Filson received his share. The share belonging to the other party to the contract was set apart, and is the wheat here involved. On April 19, 1898, Ditton executed and delivered to Thomas S. Edison, one of the defendants herein, a quit-claim deed to said land, which deed was in effect a mortgage to secure an indebtedness due the latter. On April 23, 1898, the land was sold by the sheriff of Nelson county under a foreclosure of a mortgage thereon executed by Ditton in 1894 to H. L. Whithed, the plaintiff in this action, to whom the usual sheriff's certificate of sale was executed and delivered. No redemption from this sale has been made. At the time of the threshing and division of the grain Edison took possession of 1,012 bushels of wheat, which was the portion set over as rent, and caused the same to be conveyed to the defendant's elevator, where it was placed in a special bin, in his (Edison's) name. This is the grain in controversy, and was of the value of 40 cents per bushel at the commencement of this action. Possession of said grain was demanded by plaintiff prior to the commencement of this action, and refused.

It is appellant's contention that by virtue of his purchase of the land at the foreclosure sale on April 23, 1898, he came into all of the rights which either Ditton or Edison had in the contract under which the land was farmed during the redemption period, and is entitled to assert the same title and right of possession to the grain in question which they or either of them might have asserted thereunder had there been no foreclosure sale, and by the same remedies. This contention is based upon section 5549, Rev. Codes, which, in part, reads. as follows: "The purchaser from the time of the sale until a redemption, and a redemptioner from the time of his redemption until another redemption is entitled to receive from the tenant in possession the rents of the property sold, or the value of the use and occupation thereof." This same statute has been in force in California for many years, during which it has been repeatedly passed upon by the Supreme Court of that state. In *Reynolds* v. *Lathrop,* 7 Cal. 43, it was held that the effect of the sale was equivalent to an assignment of the lease, and that the plaintiff in

that case, who was the purchaser, "could sue for the rent, as often as it fell due, under the terms of the lease existing when he became purchaser." This case was followed in *McDevitt* v. *Sullivan,* 8 Cal. 593, which went further, and held that when the tenant had paid the rent for the redemption period to his landlord in advance, the purchaser could require him to pay it over again. In *Harris* v. *Reynolds,* 13 Cal. 515, the words "tenant in possession," as used in the statute, were construed and held to include the owner who is in possession, as well as others who have possession under any kind of title. The court said: "The phrase 'the tenant in possession' is a generic term intended to designate the class of persons from whom the purchaser was to receive the rents. The language is not, when a tenant of the debtor is in possession, the tenant shall pay the purchaser, or that the debtor when in possession shall not; but the phraseology designed, evidently, to fix a general right applying to all cases of tenancy, for none are excluded. * * * The definition of 'tenant in possession' embraces within the natural and usual meaning of the words a judgment debtor as well as his lessee. The owner in fee in possession is no less, in legal contemplation, a tenant, than the man who occupies under him. The definition of 'tenant' is 'one who holds or possesses lands or tenements by any kind of title, either in fee, for life, years, or at will.'" So, too, in *Hill* v. *Taylor,* 22 Cal. 191, it was held that the purchaser of a mine at a mortgage foreclosure sale was entitled to the profits of the mine, which the mortgagor was working himself. That court further said, in discussing relative rights of the purchaser and original owner after sale, in *Page* v. *Rogers,* 31 Cal. 294: "The purchaser acquires an equitable estate in the lands, conditional, it is true, but which may become absolute by simple lapse of time, without the performance of the only condition which can defeat the purchase. The legal title remains in the judgment debtor, with the further right in him, and his creditors having subsequent liens, to defeat the operation of a sale already made during a period of six months, after which the equitable estate acquired by the purchaser becomes absolute and indefeasible, and the mere dry, naked legal title remains in the judgment debtor, with authority in the sheriff to devest it by executing a deed to the purchaser. Even during the period which elapses between the sale and expiration of the time for redemption the statute regards the purchaser as the owner in equity, and gives him the rents and profits, or the value of the use and occupation. * * * In short, it gives him the entire beneficial interest in the property, except the actual possession." Later, in *Walker* v. *McCusker,* 71 Cal. 594, 12 Pac. Rep. 723, it was held that "when real property is sold at a foreclosure sale a party to the foreclosure suit, who thereafter remains in possession under a claim of title, which is subject to the mortgage, is a tenant in possession, within the meaning of section 707 of the Code of Civil Procedure, and liable as such to account to the purchaser, in *assumpsit,* for the value of the use and occupation." See, also, *Kline* v. *Chase,*

17 Cal. 596; *Knight* v. *Truett,* 18 Cal. 113; *Walls* v. *Walker,* 37 Cal. 424; *Webster* v. *Cook,* 38 Cal. 423.

The same question which is now presented by the appellant was before this court in *Clement* v. *Shipley,* 2 N. D. 430, 51 N. W. Rep. 414, in a form not materially different. In that case the plaintiff, as a purchaser at a foreclosure sale, was seeking to collect the rents due from the lessee, during the period of redemption, to the lessor, according to the terms of the contract existing between the parties to the lease. His right to recover was upheld, following the California cases to which we have referred. The recovery in that case was money, and was the sum fixed by the contract between the lessor and lessee as stipulated compensation for the use of the property there involved. In the case at bar the compensation agreed upon for the use of the land is not money, but property, and it is the particular property involved in this suit. We do not think that this changes the principle, or militates in any way against the plaintiff's right to recover. It is true, the plaintiff does not sue to recover a money judgment for "the value of the use and occupation" for the year of redemption, and very properly does not; for, if he had brought that form of action against the parties who occupied the land, he would have been confronted by the contract between Ditton and Filson under which the farm was operated, which provides for the payment for its use in property, and in a particular manner. That contract, in the absence of fraud or collusion (and there was none) is binding upon plaintiff. He can demand no more from the tenant than could Ditton. Neither could Filson, the tenant. be required to pay for the use of the land any more or in different manner than he had stipulated to do. Further, the statutory right to· rent during the redemption period does not limit the purchaser to the recovery of money rent. The word "rent" is comprehensive, and embraces "the compensation, either in money, provisions, chattels, or labor received by the owner of soil from the occupant thereof." 3 Kent, Comm. 460; 2 Steph. Comm. 23; Jac. & G. Landl. & Ten. § 38. It is not necessary to technically classify the contract under which the land in question was farmed during the period of redemption. It is sufficient for the purposes of this case that it is the contract which fixed the compensation of the owner of the land for its use, and that the compensation so fixed is the wheat here involved. Under this contract the owner of the land could at all times maintain replevin for his share, and until division was made for the entire crop. See *Angell* v. *Egger,* 6 N. D. 391, 71 N. W. Rep. 547. We therefore hold that the plaintiff by his purchase at the foreclosure sale was substituted to the rights which the owner of the land had in the contract under which it was operated during the period of redemption, and it is not important whether it was Ditton or Edison. That contract gave the title to and right of possession of the particular wheat here involved to Ditton. To this plaintiff succeeded by his purchase at the foreclosure sale. Having then the same rights in the contract which either Ditton or

Edison had, it would seem unnecessary to add that he is entitled to the same remedies which they might have had to protect and enforce their interests in and under this contract. Those, of course, would include the right to recover the possession of the property in the manner now being pursued by the plaintiff. Our conclusion is that the facts found entitle the plaintiff to a judgment against the defendants for a return of the wheat in question, in quantity 1,012 bushels, or for its value, which is found to be $404.80 on October 1, 1898, in case a delivery thereof cannot be had. The judgment of the District Court is reversed, and that court is directed to enter judgment for the plaintiff upon its findings of fact.

BARTHOLOMEW, C. J. I fully concur in the opinion prepared by Justice Young. But deeming the question involved to be of great practical importance, and conceiving that much misapprehension prevails in the minds of the profession as well as the laity as to the exact condition of the law upon the question in this state, I wish, in concurring, to add a few thoughts to what my associate has said. A restatement of the facts is unnecessary. It is important, I think, to determine as nearly as may be the exact nature of the contract entered into between Ditton, the mortgagor, and the man Filson. If Filson was simply hired by Ditton to raise a crop upon the land, and was to receive as compensation for his labor in so doing a certain share of the crop produced, and if that be the entire scope of the contract, then, of course, Filson had no interest in the land. Ditton was the real party in possession during the year of redemption, and the plaintiff, the purchaser at the foreclosure sale, could recover nothing, as against him, as rent, as that word is used in the statute, because no rent had ever been agreed upon, and the owner, as tenant in possession, would be liable only for "the value of the use and occupation thereof," and the purchaser could claim title to no specific property as representing such value, and this action must fail. The result will be different if the contract made Filson the tenant in possession. I am clear that such was the intent, purpose, and effect of the contract. The form of contract used in this case is quite common in this state. It starts out by declaring: "Witnesseth, that the party of the first part (Filson) hereby agrees to and with the party of the second part (Ditton), for the consideration hereinafter named, to well and faithfully till and farm, during the season of farming in the year 1898, commencing April 1st, 1898, and ending April 1st, 1899, in a good and husbandlike manner, and according to the usual course of husbandry, the following described premises." Then follow certain details of reciprocal obligations, and the contract continues: "And, until all the covenants and agreements to be performed by the party of the first part shall have been fulfilled, the title and possession of all hay, grain, crops, produce, stock, increase, income, and products raised, grown, or produced on said premises shall be and remain in the party of the second part, and said party of the second part has the right to take and hold enough

of the crops, stock, increase, income, products, that would by the division belong to said party of the first part to repay any and all advances made to him by the party of the second part, and interest thereon at 8 per cent. per annum, and also to pay all indebtedness due said party of the second part by said party of the first part, if any there be." The evident intent of this contract was to deprive the tenant of that which under an unrestricted lease would be his, *i. e.* the title to the crops produced by himself upon the land, and to vest such title in the landlord. The object of this is two-fold: First, it secures the rent in a state where landlords' liens are unknown; and, second, it secures all advances which the landlord may make to the tenant for seed grain, supplies, hired help, etc. It is of great advantage to the landlord; and in *Angell* v. *Egger*, 6 N. D. 391, 71 N. W. Rep. 547, this court said that the tenant might make such a contract, and yet the instrument remain a lease, and the relations of landlord and tenant exist. If it were the intention of the parties that Filson should have the possession and use of the land, he then by the contract acquired an interest in the land; and if the amount of the crop that should ultimately belong to Ditton, irrespective of any advances or indebtedness, was so reserved as rent, then the contract was a technical lease. It is clear to me that Filson was to possess, control, and use the land. By the contract he covenants "to commit no waste or damage on said real estate, and to suffer none to be done." This latter covenant would be impossible of performance if he had not exclusive control. Again: "It is also agreed that, in case said party of the first part (Filson) fails to perform any of the conditions and terms of this contract on his part to be done and performed, then said party of the second part (Ditton) is hereby authorized and empowered to enter upon said premises and take full and absolute control of the same." This is the usual provision for re-entry by the landlord, and can have no force unless the tenant is in possession in his own right. Again: "This contract shall not be assignable or sublet by the party of the first part without the consent of the party of the second part." It could not be "sublet" by Filson unless it had previously been "let" to him. If it had been let to him, what he paid therefor was rent, and the contract is a lease, notwithstanding the fact that some of its provisions, standing alone, might import the contrary. Said the court in *Walls* v. *Preston*, 25 Cal. 60: "The character of the instrument must be determined upon the consideration of all its terms and provisions, and the court will give it such a construction as will carry into effect the intention of the parties, without regard to the technical terms employed. Although words are used which, if disconnected from other parts of the instrument, would import a lease, they will not be so construed if the evident intention was merely to make a cropping contract. Nor, on the other hand, will the instrument be so construed as to deprive the occupant of the position of a tenant of the land, if from the whole instrument it is

apparent that the parties intended he should enjoy the exclusive possession of the premises." See, also, *Townsend* v. *Isenberger*, 45 Ia. 670; *Chandler* v. *Thurston*, 10 Pick. 205; *Walker* v. *Fitts*, 24 Pick. 191. In 12 Am. & Eng. Enc. L. 977, it is said: "No particular form of expression or technical words are necessary to constitute a lease, but whatever expressions explain the intention of the parties to be that one shall devest himself of the possession of his property, and the other shall take it, for a certain space of time, are sufficient, and will amount to a lease for years, as effectually as if the most proper and permanent form of words had been made use of for that purpose." I am aware that some courts, while not holding that contracts of this character are not leases, have yet preferred to designate them as contracts of adventure. *Taylor* v. *Bradley*, 39 N. Y. 129; *Bowers* v. *Graves* (S. D.) 66 N. W. Rep. 931. But see the remarks of Woodruff, J., in *Taylor* v. *Bradley*, as to what would be the holding in New York were the question new there, as it is here. In all cases of leasing of realty for farming or commercial purposes, it is a contract of adventure, so far as the lessee is concerned. In this case there is the added uncertainty as to the value of what is to be paid for rent. But that always happens when the rent is payable in kind. When the cases speak of certainty as to the rent, they mean simply that the contract must determine what the rent is to be, and not its value. If to be paid in a share of the crop, the contract must determine what share. I do not think that the fact that the owner of the land was in this case to hold the title to the crop destroys the contract as a lease. Rather, to my mind, it has the opposite effect. The express provision was inserted because the parties understood that if it was not inserted the title would be in the lessee, and, as stated, it was inserted as security, and to that extent the provision is in the nature of a mortgage. But it is certain that the owner intended by the contract to dispossess himself and place the tenant in possession, and that, too, not merely for the time necessary to produce a crop, but for a year certain; and during the entire term, if the tenant performed his covenants, any interference with his possession by the owner would have been a trespass. Among the results that follow at common law if the contract be considered as a lease is the fact that a conveyance of the reversion carries with it all rents under the lease which have not already become due, and ripened into a right of action for money in the hands of the lessor. In Wood, Landl. & Ten. 722, it is said: "A sale of the reversion carries with it, unless expressly reserved, all rents and rights under a lease previously granted that subsequently became due, and the grantee may recover them in an action in his own name. Upon such conveyance the grantee takes the place and assumes the rights and liabilities of the original landlord. In other words, he becomes landlord as fully as though the lease had been made by himself, whether he knew all the terms of the lease or not." In *Townsend* v. *Isenberger*, supra,

it is said, "Rent reserved by lease, and not accrued, passes by a conveyance of land to the grantee;" citing *Abercrombie* v. *Redpath*, 1 Ia. 111, and *Van Driel* v. *Rosierz*, 26 Ia. 575. Again: "A purchaser under an execution sale is entitled to the rent accruing or falling due after the execution of the sheriff's deed;" citing *Bank* v. *Wise*, 3 Watts, 394; *Martin* v. *Martin*, 7 Md. 368. Where rent is payable at stated periods, as quarterly or yearly, it will not be apportioned, in the absence of an express reservation. The party holding the reversion when the rent falls due is entitled to the whole thereof. In *Bank* v. *Wise*, supra, the premises were rented for an annual rental of $425, payable half-yearly. Fourteen days before a half year's rent became payable, the premises were sold under execution. The court said: "The idea of apportioning the rent that becomes payable after the purchaser of the reversionary interest in fee at a sheriff's sale has paid the purchase money and received his deed of conveyance for it, between him and the defendant in the execution, as whose estate it was sold, is unknown to the law, and cannot be reconciled with any of its analogous and fixed principles." And in a contest between the landlord and the purchaser the latter was allowed to recover the entire half year's rent, although he purchased the property only 14 days prior to the expiration of the half year. This case was expressly approved in *Burns* v. *Cooper*, 31 Pa. St. 426. This was also a case of judicial sale, where the rent was a share of the crop, and the court said: "The rent (*i. e.* one-half of the grain) was not payable until the crop should ripen and be harvested. If the reversion did not pass to Cooper until the 1st of April, 1856, it still passed before the rent became payable; and the principle is that rent is incident to the reversion until it becomes both *debitum et solvendum*. Until then it passes with the land to the heir, devisee, or purchaser, and not until then does it become personal and go to the executor. Until then it is no debt." *Dixon* v. *Niccolls*, 39 Ill. 372, was a case where farm lands were leased for a share of the crop, to be delivered when the crop was threshed. The farm was sold without reservation on October 1st of the year for which the farm was leased. At that time the crop was cut and stacked on the premises. It was threshed on October 24th. The court held the purchaser entitled to the entire rent. See, also, *Montague* v. *Gay*, 17 Mass. 439. To the several California cases cited in the main opinion as holding that the foreclosure sale operates as a conveyance to the purchaser at such sale of the entire beneficial interest of the owner, save the right of redemption, and the bare right of possession during the redemption period, the following cases may be added: *Harris* v. *Reynolds*, 13 Cal. 515; *Shores* v. *River Co.*, 21 Cal. 135; *Henry* v. *Everts*, 30 Cal. 425; *Robinson* v. *Thornton*, 102 Cal. 680, 34 Pac. Rep. 120; *Duff* v. *Randall*, 48 Pac. Rep. 66.

I cite the foregoing authorities, not to establish the elementary principle that a voluntary conveyance of leased premises operates

as an assignment of the lease, and conveys to the purchaser full right to collect rent thereunder, but to show that such conveyance assigns to the purchaser the right and title to all rents not then due by the terms of the lease, however much they may be earned, and to show that the same principles apply to judicial or foreclosure sales. True, many of the cases speak of the payment of the purchase money and receipt of sheriff's deed as entitling the purchaser to the rents, but those cases were sales where no provision was made for redemption. The California cases deal with sheriff's certificates, and apply the same rule as in cases of deeds. Certainly nothing less can be insisted upon under our statute. Section 5538, Rev. Codes, declares, "Upon a sale of real property the purchaser is substituted to and acquires all the right, title, interest and claim of the judgment debtor thereto," subject, as has been said, to the debtor's right of redemption, and his bare right of possession during the redemption period. With this limitation, every right, title, interest, and claim of the debtor is sold, and passes to the purchaser, in all respects, to the same extent that it would pass by a voluntary conveyance. All title to crops that was by the lease reserved in the landlord is transferred by the sale to the purchaser, and all the rights of the landlord under his lease to enforce the payment of rent inure to the benefit of the purchaser. And upon what is the underlying principle that gives to the purchaser all rents not yet due, however much they may be earned, based? It is simply that they constitute a part of the estate that is bought and paid for. They enhance the value of the estate just as certainly as would a growing crop, and just as certainly they form a part of that for which the consideration is paid. I have not seen this more clearly stated anywhere than by Kennedy, J., in *Bank* v. *Wise,* 3 Watts, 397: "But then to say that the lessee, even at the expiration of the half year, shall be bound to pay the rent for the last three months thereof to the purchaser, and for the first three to the defendant in the execution, would be to split up a demand into two, which, by the terms of the contract giving rise to it, was one and entire, and would subject the lessee to two actions instead of one, contrary to his agreement, and contrary to a well-known rule of the common law. As the lessee, however, has had the full enjoyment of the leased premises, there can be no good reason for his not paying the whole of the half year's rent, as soon as it shall become payable by his lease, to the party entitled to receive it. Then, seeing the purchaser has succeeded to the rights of the landlord, why shall he not receive the whole rent? The only reason, of the least plausibility, that can be alleged for apportioning the rent according to time between the defendant in the execution and the purchaser at sheriff's sale, by giving one-half of it, on account of the first three months of the half year, to the defendant in the execution, and the other half, for the last three months, to the purchaser at sheriff's sale, would be to say that it did not properly and truly form any part of

the subject-matter or estate sold by the sheriff; that the defendant in the execution had received no consideration, and the purchaser had paid none for it. But, by inquiring into and ascertaining what was really sold and bought at the sheriff's sale, it will be seen that there is no ground whatever for such a suggestion, and that it is a great misapprehension of the matter to suppose it; for we shall find that the purchaser at sheriff's sale not only purchased, but must be considered as having paid for, and as being invested with, a right to demand and receive all the rents which shall become payable, according to the terms of the lease, after the time that his title to his purchase became perfect, by his payment of the purchase money, and receipt of the sheriff's deed. A right to demand and receive all such rents formed the very heart and essence of his purchase, seeing it was merely a reversionary interest." Nor does this work any hardship upon the execution or mortgage debtor. He gets the full benefit of this enhanced value. It goes to pay his debt, or is returned to him by way of surplus. I find nothing in our statute that conflicts with these well-settled principles. It says that the purchaser from the time of his purchase until a redemption is entitled to receive from the tenant in possession the rents. But the rents he is to recover for that time are the rents accruing during the period. The fact that in case of redemption all rents received must be credited upon the debt does not change the relative conditions. Redemption can be made only by paying the amount of the purchase price, with interest, as provided by statute; and the purchaser, being only required to credit the amount of rent actually received, would still have his original purchase price, with the interest. The application of these principles to the case at bar makes it clear that if, under the contract in question, the title to the crop remained in Ditton, by the purchase that interest was transferred to this plaintiff, and after the crop had been divided under the lease, and the one-half that was to be kept by the landlord as rent had been placed by itself, then plaintiff's title to such half, and to every part thereof, became absolute; and if then a third party, without plaintiff's knowledge or consent, conveyed it to a point where it had an increased value, and the defendants there unlawfully detained it, plaintiff might recover the grain or its value at that point. The judgment is properly reversed. I am authorized to say that Young, J., fully concurs in these views.

WALLIN, J. In this case I am compelled to dissent. I cannot concur either in a reversal of the judgment of the District Court, or in the reasoning upon which that result is accomplished. It would seem that a majority of the court are inclined to base plaintiff's right to recover chiefly upon supposed rights which the plaintiff secured as purchaser of the realty at foreclosure sale, and in this the court, in my judgment, is in error. The purchaser, as such, acquired no right either to the rents, or to the value of the use of the premises, during the redemption period. The right to recover is based wholly upon a statute which was expressly enacted to confer

a right upon purchasers which did not exist as a result of any execution or foreclosure sale of realty. Repeal this additional statute, and no action could be maintained either for the value of the use, or to recover rent, during the period of redemption. Upon this point the Supreme Court of California, in *Walker* v. *McCusker,* 12 Pac. Rep. 723, says: "The defendant's liability is statutory." And in *Shores* v. *Scott River Co.,* 21 Cal. 135, the same court, in construing this statute, declares that: "The statute only gives a remedy against the tenant in possession. The right to recover rests upon the statute, and the tenant in possession is the only person against whom the right exists." It is needless to say that, where a right of action is purely statutory, it is incumbent upon the plaintiff to bring his case within the fair import of the language of the enactment which confers the right of action. In the case at bar the plaintiff has chosen to sue for rent accruing, as plaintiff claims, within the redemption period. The statute authorizes a purchaser to receive the rent, but in suing for rent the plaintiff necessarily assumes the burden of showing that the defendant had undertaken to pay rent, or in some manner had bound himself to do so. It is not enough that plaintiff in this case shows some right of action. He sues for rent, and that alone, and he can recover upon no other theory than that of a re-entry of the premises. It is, however, one of the anomalies of this case that the defendant Edison never had anything to do with renting the premises or with raising the crop in question; nor does the plaintiff claim that Edison ever rented or cultivated the premises, or agreed to pay rent. The majority of the court have excluded any such idea by placing another person in the position of tenant and lessee, viz: Filson, who, it is conceded, raised the grain in question. Another remarkable feature of the case is that the complaint says nothing whatever about either a leasing or a renting of the premises. While the plaintiff's counsel and the court agree that the action is brought to recover rent, yet no one can gather any such idea by a perusal of the complaint or answer. Plaintiff alleges ownership of the grain, and is seeking to recover possession solely as owner. Upon his pleading the plaintiff is bound to establish title in himself, but upon the theory of the plaintiff and that of my associates the plaintiff must recover, if at all, upon the theory that the action is brought, under the statute, to recover rent. If plaintiff expects to recover upon his allegation of title, I maintain that he should show when and by what means he acquired title. From my standpoint, no title to the grain has been shown in the plaintiff. Certainly he gets no title to any grain as a result of his purchase of the realty. Nor does the statute in question give a purchaser of realty at a foreclosure sale a title to any product of the soil. The statute (section 5549) confers the right to recover of the tenant in possession either rent, or the value of the use. This right assumes and presupposes that all the products of the soil belong to the tenant in possession. This being so, the

purchaser by virtue of his purchase cannot acquire title to the
products raised during the redemption period. But, if the result
of the action is to be determined by an adjudication upon the ques-
tion of title, then it is clear to my mind that the plaintiff should
not recover. True, this court cannot upon this record enter upon
a consideration of the competitive claims of ownership as between
the plaintiff and Edison. No evidence has been transmitted to this
court, and hence all questions of fact must be regarded as settled
by the findings of the trial court. That court has found as a fact
that Edison owns the grain in question. This court cannot, if
it were so inclined, alter this finding. It must be admitted that the
findings are somewhat obscure with respect to the time at which
Edison became the owner of the grain. Nor is it made clear just
how he acquired his title. It is stated that Ditton, before the fore-
closure sale, gave a quitclaim deed of the premises to Edison, and
that the deed was intended as a mere mortgage security. A quit-
claim deed given as security, if drawn in the usual form, would
not confer title to the crop, but we are not advised as to any language
contained in this particular deed. Nor do we know what, if any,
oral arrangement was made between the parties concerning a sale
or hypothecation of the grain. The ultimate fact of Edison's owner-
ship is, however, found, and neither party has sought in any manner
to impeach this finding. The duty, therefore, of the trial court was
and this court is to apply an elementary rule of law applicable to
such a finding in a case where the right of possession hinges upon
ownership. It is this: Ownership of personalty confers a right of
possession upon the owner unless some superior right of possession
is shown. In this case the issue is squarely made in the pleadings,
and neither party alleges any right of possession other than that
based upon his allegation of ownership.

But, turning to theories (viz: theories arising wholly outside the
allegations of the pleadings), we first encounter the theory that
Filson was a tenant for years, and that he raised the grain in question
as tenant under a written lease of the premises. My Brother Bartho-
lomew has written a concurring opinion in which the conclusion is
reached that the written agreement under which Filson raised the
crop is a lease, and that Filson occupied the relation of a tenant, and
was bound by a lease to pay a stipulated rental for the use of the
land. A very careful consideration of the same instrument has led
me to an opposite conclusion. As I read the instrument, it was
framed for the express and easily recognized purpose of avoiding
and steering clear of creating the relation of landlord and tenant.
It appears to me to be drawn with an especial view to eliminate
all of the manifold advantages which at the common law accrue to
a tenant for years under a lease of real estate for farming purposes.
At the common law a tenant for years was the sole owner of all
the products of leased premises. He could sell or incumber the
crops at pleasure. But this contract strikes at the foundation of

any such claim, by declaring that title and ownership of the crop were reserved and at all times vested in the landowner. True, the landowner bound himself to pay Filson for his services in raising the crop, out of the grain raised by Filson; yet this agreement, until performed, did not operate to transfer title to Filson. Title was expressly reserved to the landowner. Under such an agreement, if the landowner had refused to turn over any of the grain to Filson, the sole remedy of the latter would be an action for damages. See *Angell* v. *Egger,* 6 N. D. 391, 71 N. W. Rep. 547. Claim and delivery would not lie in such a case. Again, a tenant under a lease may sublet the premises, unless expressly restricted. Nothing is said in this contract about subletting the premises, nor can such a right be gathered from the language of the instrument; but the party of the first part, Filson, is not permitted to either sublet or assign his rights and duties under the contract. The language is, "This contract shall not be assignable or sublet by the party of the first part without consent of the party of the second part." Nor can I see in the instrument any language giving any right of possession to Filson, other than such possession as would be necessary to a discharge of his obligation to raise a crop. The only language in the instrument bearing upon the question at all is as follows: Filson agrees, "for the consideration hereafter named, to well and faithfully till the farm during the season of farming in the year 1898, commencing April 1st, 1898, and ending April 1st, 1899, in a good and husbandlike manner, according to the usual course of husbandry." In this I can discover no purpose of conferring upon Filson any authority to live upon the land, or to occupy the same as a tenant for all purposes. On the contrary, to my mind the instrument, by this language, as well as the other language contained in it, shows that the landowner by deliberate purpose undertook to avoid the consequences of leasing the premises. The intent to make a contract of hiring, as distinguished from one of leasing, is, in my opinion, clearly manifested in the following paragraph of the instrument: "In consideration of the faithful and diligent performance of all the stipulations of this contract by the party of the first part (Filson), the party of the second part (Ditton) agrees, upon reasonable request thereafter made, to give and deliver on said farm the one-half of all grains, vegetables, so raised and secured upon said farm during said season." The language I have quoted therefore shows the nature and purpose of the contract. Filson agreed to raise the crop at his own expense, and Ditton agreed to compensate him by giving him one-half of the crop, the title to which was at all times in Ditton. At the common law the tenant is the party who agrees to pay a rental. But in this case the most searching examination of the contract fails to show any agreement on Filson's part to pay any rental, either in money or in grain. Filson's obligations were to produce the crop at his own expense. It is impossible to spell out of the instrument any obligation resting upon Filson

to pay rent in any manner. This being true, no action would lie, based upon the contract, in favor of Ditton, to recover any rent. Had Filson, after signing the contract, refused to sow the seed, or, after sowing the seed, refused to harvest the crop, an action for such breach of the contract would lie; but certainly no one would contend that the damages could be measured by any specific amount as rent. No rent having been promised, none could be recovered. It follows, of course, that the plaintiff, as purchaser, could not have acquired the right to sue Filson for rent, for the simple reason that the landowner (Ditton did not have any contract whereby he could himself sue for rent. By the very plain language of the instrument, the obligation to pay rested wholly upon the landowner, and upon no other person. Here, again, the relation of landlord and tenant is squarely reversed and contradicted. At the common law, under a renting contract, it is the tenant who is required to pay, and the landlord receives the pay. My conclusion upon this point is, of course, that the plaintiff cannot recover in this action. He sues for rent, and the facts show that no rent whatever was agreed to be paid.

But another point would, in my judgment, be equally fatal to the plaintiff's action. Let it be assumed, for purposes of discussion, that Filson was a tenant, and one who had bound himself to pay a rental for the premises. Upon this assumption it is conceded that Filson had paid his rent to his landlord, in full, long prior to the commencement of this action. By such payment, which was made without notice of plaintiff's rights, if rights he has, Filson was exonerated entirely. The statute of this state makes this point clear. Rev. Codes, § 3543. Now, it is very difficult to see how or upon what theory Ditton could have sued Filson for any rent after the rent had been lawfully paid to him. It would seem that, the obligation having been performed, no action could possibly lie for its non-performance in favor of any one; and yet this action, aside from the pleadings, is an action to recover rent, and can be sustained on no other basis.

But, aside from all other questions, it is transparently clear that the plaintiff has sued the wrong defendant. The wording of the statute under which the action is brought declares that the purchaser "is entitled to receive from the tenant in possession the rents of the property sold, or the value of the use and occupation thereof." This language is specific and unambiguous as to the party from whom the rents or value of the use are to be received. That party is the "tenant in possession." According to plaintiff's theory and that of my associates, Filson, and no other person, is the tenant in possession. It is, moreover, obvious that, unless Filson stands in the relation of a tenant, there is no rent in the case, and hence no action would lie to recover it. But the plaintiff has not sued Filson. This is clearly fatal. The statute is not obscure in meaning, and the plaintiff bases his rights upon the statute. Upon this feature of

the case *Shores* v. *Scott River Co.*, supra, is directly in point. It is my conclusion that the action was properly dismissed by the trial court.

(83 N. W. Rep. 238.)